THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CARL GRANT, Defendant-Appellant.

First District (5th Division)   No. 1—88—3473

Opinion filed July 10, 1992.

Rita A. Fry, Public Defender, of Chicago (Kim L. Sorrells and Donald S. Honchell, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Carol Gaines, and Harmon K. Aguilar, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Following a jury trial, defendant Carl Grant was found guilty of home invasion and aggravated criminal sexual assault, and was sentenced to 50 years in the Illinois Department of Corrections, followed by a three-year period of mandatory supervised release. On appeal, defendant contends that (1) his conviction for aggravated criminal sexual assault should be reversed because complainant's testimony that the assault occurred in a dark room where four other people were sleeping and no one woke up lacks credibility and is contrary to human experience; (2) the trial court erred in refusing to allow cross-examination of the complainant regarding prior sexual relations with her boyfriend to explain or rebut the medical evidence; (3) the prosecutor's comments during closing argument regarding the subpoena power of defendant to obtain the testimony of an emergency room physician impermissibly shifted the burden of proof to the defendant; and (4) the examination of the complainant's mother on redirect concerning the taking of certain photographs of her apartment building had the effect of making the prosecutor a witness. For the reasons set forth below, we affirm.

FACTS

L.F., the 13-year-old complainant, lived in an apartment with her mother, two sisters, ages 7 and 16, and three brothers, ages 7, 8 and 14. The apartment consisted of a living room, dining room, kitchen, bathroom and two bedrooms. L.F.'s mother slept in one bedroom and five of her children slept in the other bedroom. The furniture in the children's bedroom consisted of a king size mattress and box spring which were next to each other on the floor, and two dressers. L.F. and two of her brothers slept on the mattress, and two other children slept on the box spring. Her 16-year-old sister slept on a sofa in the dining room.

L.F. testified that on April 1, 1988, at about 7:30 p.m., she was at home, in bed, when she saw the defendant and his friend walking through the apartment. The defendant was on the way to his uncle's apartment, which was downstairs from the apartment where she lived. She had known the defendant for close to a year.

Later during the night, L.F. saw the defendant again. She was in bed, sleeping, but woke up to find the defendant on top of her, pulling down her shorts and underwear. The defendant called her by her nickname. His face was a foot to a foot and a half away from hers. There was light coming into the bedroom from the kitchen, bathroom and a window.

L.F. testified that she tried to sit up and pull her shorts back on, but the defendant pushed her down and put her hands behind her back. He then vaginally penetrated her and "started pumping" on her. She was crying softly and tried to push him away. She thought that he had a knife. He told her to stop trying to push him away or it was going to hurt. L.F. testified that after he was finished, she felt sperm on her vagina and on her underwear.

L.F. ran to the bathroom, where she found her mother, and told her mother that "Carl raped me." When she and her mother went into the living room, the window, screen and door were open. Her mother took her to the police station and then to the hospital.

Eight days later, L.F. identified the defendant in a lineup.

On cross-examination, L.F. testified that she did not yell out or scream. Her elbow was touching her eight-year-old brother sleeping next to her.

The defense then attempted to question L.F. about her boyfriend. When he asked L.F. whether she had told the police that she had sex with her boyfriend the day of the alleged rape, the State objected. The court sustained the objection. At a sidebar, defense counsel argued that L.F. had told a police officer that she had sex with her boyfriend at noon on the day in question. It was the defense position that someone other than the defendant may have been the source of the seminal material detected on swabs taken from the victim following the alleged assault since seminal material may remain in the body for up to three days after sexual intercourse, and that this fact cast doubt on the validity of the scientific evidence to be presented later.

As his offer of proof, defense counsel stated:

> "If I call the officer, I don't know what her response would be, yes or no, if she admitted or denied, but I would elicit testimony from Officer Patterson where she indicated to him when he interviewed her she allegedly had sex with her boyfriend.
>
> * * *
>
> Just so that we did talk to her and my partner did remind me and she does have a boyfriend and she has had sex with him two or three times and she told us the last time four or so months prior to this incident."

The court ruled that any reference to sexual activity by the complainant with her boyfriend was barred by the rape shield statute (Ill. Rev. Stat. 1987, ch. 38, par. 115—7), and instructed the jury to disregard the last question.

Janice Reisse, an emergency room nurse at Ingalls Memorial Hospital, testified that she saw L.F. in the early hours of April 1, 1988. L.F. told her that she had been raped. Nurse Reisse collected hair and blood samples from L.F., and also was present when the emergency room physician examined L.F. and took vaginal swabs for evidence.

On cross-examination Ms. Reisse testified that she observed one abrasion on L.F.'s face, but she noted that it was an old abrasion. She did not see any marks or bruises anywhere else on L.F.'s body.

Sadie Fulwiley, L.F.'s mother, also testified at trial. She described her children as sound sleepers, and said that it was not unusual for her children to sleep while the radio or television was on or while a party was in progress.

Sadie Fulwiley testified that on the evening of March 31, 1988, she was at a card party at a house two doors down from hers. She left the party at about 3 a.m. on April 1, after drinking seven or eight beers, and went home. Upon arriving home, she went straight to the bathroom. Her daughter came to the bathroom door and told her mother that Carl had raped her. She and her daughter went into the living room and found one of the windows and a screen open. She nailed the window shut before she and her daughter walked 5½ blocks to the police station.

Sadie Fulwiley also testified that prior to April 1, 1988, it was usual for her to see the defendant around her house three or four times a week. After April 1, 1988, she did not see him again until April 9, 1988, the day L.F. identified him in a lineup.

The prosecutor showed Mrs. Fulwiley several photographs, which she identified as photographs of the exterior of her apartment building. On cross-examination, she said that the pictures had been taken three or four days prior to trial by two State's Attorneys.

Also on cross-examination, Mrs. Fulwiley stated that when she came out of the bathroom, she looked in on the other children in the bedroom and they were all asleep. The 16-year-old was asleep on the sofa in the dining room and did not wake up until her mother "shook her and hollered her name out a couple times."

On redirect, the State asked several other questions about the photographs of the apartment, without any objection at that time:

"[Prosecution]: Q: Sadie, you testified that both Mr. Cahill and myself came out to your apartment on Saturday, this past Saturday; is that correct?

A. Yes.

Q. We both came out there. Do you remember who was taking the pictures?

A. You.

Q. Do you remember when I first started taking the pictures that I started by taking pictures of the front of the house?

A. Yes.

Q. And I took three from a far distance from the front and three more close up of the porch?

A. Yes.

Q. These are the pictures you see here?

A. Yes.

Q. Then do you remember me taking pictures of the door and of the window?

A. Yes."

Officer Lawrence Patterson, a detective with the Harvey police department, also testified for the State. Prior to Patterson's testimony, defense counsel, outside the presence of the jury, requested permission to ask him whether L.F. had told the officer that she had had sexual relations with her boyfriend on March 31. As an offer of proof, counsel stated that, if asked, the officer would indicate that L.F. told him that she had sex with her boyfriend at noon on the 31st. The prosecutor countered that he was present for that conversation, and no mention was made of sex with the boyfriend. The court denied defense counsel's request, but stated "the offer of proof can be developed through Officer Patterson, if necessary, outside the presence of the Jury, so that it is fully preserved for whatever purposes." Defense counsel responded "my offer is consistent with what was stated initially," and made no further attempt to question Officer Patterson on the subject.

When the jury returned, Officer Patterson testified that the defendant surrendered himself to the police on April 9, 1988. Later that day a lineup was held, and L.F. identified the defendant by sight and by voice. Patterson described the defendant as 30 years old and approximately 6 feet 1 inch tall. L.F. is approximately 5 feet 6 inches tall and weighs 130 pounds. Patterson described L.F. as a shy, non-talkative "closet" child who would not speak up for herself.

Officer Patterson testified that L.F. told him she did not fight with the defendant because he said that he would hurt one of her brothers who was in bed with her. The defendant had his hands on her neck and was choking her. He also smelled like alcohol.

The final witness was Judy Welch, a forensic scientist in serology with the Joliet crime laboratory. She testified that tests conducted on blood samples from L.F. showed that L.F. was an ABO type O secretor. Tests performed on blood and saliva samples taken from the defendant showed him to be ABO type A secretor. The vaginal swabs taken from L.F. in the emergency room indicated the presence of seminal material, ABO type A, which Welch testified could have originated from the defendant. Tests performed on seminal material on L.F.'s underpants were inconclusive.

Welch also examined pubic hair combings taken from L.F. and compared them with samples taken from the defendant and from L.F. and her brother who slept next to her. One of eight hairs exhibited an unusual characteristic known as an "exploded medulla," and was consistent with the defendant's pubic hair samples and inconsistent with samples taken from L.F. and from her brother.

On cross-examination, Welch was asked about another genetic marker, PGM, which is an enzyme present in blood and seminal material. Although the defendant was a PGM 1 plus, no PGM activity was detected in the seminal material tested. Welch also stated that the seminal material detected on the vaginal swabs could have been present for three days.

On redirect, Welch explained that tests for PGM are affected by the time between collection of a sample from the victim and the time the sample is tested. In addition, contaminants may degrade PGM activity but would have no effect on ABO activity. She stated that it was not uncommon to detect no PGM activity on a semen-stained swab, and that the failure to detect such activity in this instance did not affect her conclusion as to the possible source of the semen.

The State then rested its case. Out of the presence of the jury, the defense requested a continuance to allow it to attempt to secure the testimony of the emergency room doctor who had treated L.F. The request was denied, and the defense rested, presenting no witnesses.

In closing arguments, the defense commented on the fact that the emergency room doctor who treated L.F. had not been called as a witness by the State to testify as to any physical injury to L.F.

"Here is the one true expert that checked that vaginal area to determine if there was any injury, any trauma, any lacerations.

No testimony, the State did not present any testimony what-soever from any medical doctor to show you that, Ladies and Gentlemen.

Reasonable doubt.

* * *

Where is the one true expert, the doctor? Where is he at, who would testify concerning the condition of this vagina? The nurse says there was no bleeding, she doesn't see any.

If the act physically occurred between a person that size and [L.F.], that girl's vagina would be traumatized, it's that simple, it was not.

Reasonable doubt, Ladies and Gentlemen."

In rebuttal, the prosecution responded:

"We could have called him [the doctor], why didn't we call him?

Well, he has the same subpoena power I do in this court-room, we are equals, I don't have him, I am representing the People, but I don't have any more power in this courtroom than him.

He can subpoena anybody he wants to, Mr. Grant can.

The doctor didn't testify, the doctor wasn't subpoenaed, we didn't have any reason to call him in, if he wanted to call him, he could have."

An objection by the defense was overruled.

The jury found the defendant guilty of home invasion and aggra-vated criminal sexual assault. He was sentenced to 50 years' impris-onment followed by a period of three years' mandatory supervised re-lease. This appeal followed.

Opinion

Defendant's first argument is that the evidence introduced at trial does not remove all reasonable doubt as to his guilt. He contends that the events testified to by L.F. are contrary to common sense and ordi-nary human experience. He also questions her identification of him as her attacker.

It is the jury, however, and not this court, which is charged with the responsibility of weighing the credibility of witnesses. (*People v. Eyler* (1989), 133 Ill. 2d 173, 191, 549 N.E.2d 268.) The test to be em-ployed on review in all criminal cases when the sufficiency of the evi-dence is questioned is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v.*

*Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267. See also *People v. Schott* (1991), 145 Ill. 2d 188, 582 N.E.2d 690.) Here, we conclude that a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of aggravated criminal sexual assault.

▪ As to L.F.'s identification of the defendant, she testified that she had known the defendant for almost one year prior to the assault. During the assault, the defendant's face was no more than a foot and a half from L.F.'s, and she testified that there was light in the bedroom from a window and from the kitchen and bathroom. Thus she had ample opportunity to observe and identify the defendant. In addition, he spoke to her, calling her by her nickname. When the assault was over, L.F. immediately went to find her mother and told her "Carl raped me." Eight days after the attack, L.F. identified the defendant by sight and voice, in a police lineup.

L.F.'s clear and unequivocal identification of the defendant as her assailant distinguishes this case from that of *People v. Appleby* (1968), 104 Ill. App. 2d 207, 213, 244 N.E.2d 395, cited by defendant, in which the court reversed defendant's conviction in part because of the complainant's identification of the defendant which the court characterized as "susceptible to error." The complainant in *Appleby* had never seen the defendant prior to the attack, and when she saw him two days after the attack, was not positive that he was the one who had raped her. In addition, in *Appleby* there was a question as to the lighting conditions during the attack.

▪ Defendant, however, argues that L.F.'s story is unbelievable since it is contrary to common sense and human experience, pointing to the fact that, according to L.F., her four siblings were asleep in the bedroom where the assault occurred, yet not one of them woke up. Two of her brothers were even in the same bed, and her arm was touching one of them. L.F.'s mother, however, testified that her children were sound sleepers. The assault occurred at 3 in the morning, a time at which it is reasonable to assume that the children would be in deep sleep. In addition L.F. testified that she did not cry out or scream for fear that defendant would hurt her or her siblings.

Counsel for defendant made the same argument to the jury in his closing statement as he makes here, and the jurors obviously found her story to be believable. We will not substitute our judgment for theirs. It is not beyond plausibility that children who are accustomed to the sleeping arrangements presented here would not wake up during the assault. Nor is it implausible for a 13-year-old child, described as a shy, nontalkative "closet" child, to refrain from screaming under the circumstances of this occurrence.

Defendant also contends it is contrary to human experience that L.F.'s mother returned home during the alleged attack and went directly to the bathroom without hearing any noise or crying. However, Sadie Fulwiley had just returned from a party where she had consumed seven or eight beers. We see nothing incredible in her actions or the fact that she heard nothing from the children's room. L.F. testified that she did not cry or scream.

We likewise are not persuaded by defendant's contention that it is contrary to human experience that a 13-year-old who had just been sexually assaulted could walk, without any apparent difficulty, 5½ blocks to the police station. There was no evidence presented that the attack was particularly painful, or that it injured L.F. so as to cause her difficulty in walking.

In addition, other evidence supports the verdict. L.F.'s mother testified that the defendant usually came around the house several times a week prior to the attack. After the attack, he was not seen again until eight days later, when he turned himself in to the police and L.F. identified him. This sudden absence following the attack lends further support to a reasonable inference of guilt.

The scientific evidence is also consistent with the verdict. Seminal material on vaginal swabs taken from L.F. were of a type which could have come from the defendant. One pubic hair was also consistent with the sample taken from defendant, including the unique "exploded medulla," and inconsistent with samples taken from both L.F. and from the brother who slept in the same bed.

In sum, we find that a rational trier of fact could have found defendant guilty of aggravated criminal sexual assault beyond a reasonable doubt and, therefore, reject defendant's first claim of error.

Defendant's second claim of error concerns the trial court's refusal to allow cross-examination of L.F. about her prior sexual relations with her boyfriend. The defendant argued at trial that questions about prior sexual activity were necessary to rebut the medical evidence and to show that semen which was detected in vaginal swabs taken from the victim following the alleged assault could have originated from someone other than himself. The trial court ruled that the rape shield statute (Ill. Rev. Stat. 1989, ch. 38, par. 115—7) prohibited such inquiry.

The rape shield statute provides, in part:

> "In prosecutions for aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse or criminal sexual abuse, the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning

the past sexual conduct of the alleged victim with the accused."
(Ill. Rev. Stat. 1989, ch. 38, par. 115—7(a).)
Our supreme court has held that this statute is clear in prohibiting evidence of a victim's past sexual conduct, but that when such evidence is relevant and based upon a showing of bias, motive or prejudice, a defendant's constitutional right of confrontation through cross-examination will supersede the protections of the statute. *People v. Sandoval* (1990), 135 Ill. 2d 159, 552 N.E.2d 726.

The *Sandoval* court did not directly address the question before us, namely, whether evidence of prior sexual activity would be admissible to explain or rebut medical evidence. The court did recognize, albeit by way of *dictum*, that under some "extraordinary circumstances," evidence of past sexual activity by the victim would be both relevant and its admission necessary to preserve the defendant's right to confrontation. One such circumstance would be when the evidence is " ' "explanative of a physical fact which is in evidence at trial, such as the presence of semen." ' " (*Sandoval*, 135 Ill. 2d at 185, quoting *People v. Hackett* (1984), 421 Mich. 338, 355 n.4, 365 N.W.2d 120, 128 n.4, quoting *United States v. Kasto* (8th Cir. 1978), 584 F.2d 268, 271 n.2.) Other cases cited in *Sandoval* where evidence was allowed to explain physical evidence include *Shockley v. State* (Tenn. 1978), 585 S.W.2d 645 (evidence allowed to show possibility that another caused pregnancy), and *State v. La Clair* (1981), 121 N.H. 743, 433 A.2d 1326 (evidence allowed to explain physical injuries). *Cf. People v. Wilder* (1986), 146 Ill. App. 3d 586, 496 N.E.2d 1182, decided prior to *Sandoval*.

Thus, while the *Sandoval* court explicitly held only that evidence of prior sexual activity is admissible to show bias, prejudice or motive, it did not foreclose the possibility that such evidence would also be admissible in a case such as this. "Although we certainly recognize that there may be certain situations in which the preclusion of the rape shield statute may not apply because of the defendant's greater constitutional right to confrontation, we need not specifically adopt the rationale of our sister State courts since we conclude that we are not here confronted with an applicable situation demanding emphasis of the right of confrontation over the preclusion of the rape shield statute." *Sandoval*, 135 Ill. 2d at 191-92.

■ We too need not decide whether the evidence which defendant here sought to introduce was admissible notwithstanding the statute, since defendant has failed to make an adequate offer of proof and thus waived the issue for review. (*People v. Wilder*, 146 Ill. App. 3d at 589 ("failure to make an adequate offer of proof results in waiver,

for purposes of review, of the question of whether the trial court erred in excluding evidence").) In *Wilder*, defendant sought to introduce evidence that the victim's physical condition was due to prior sexual relations with others. The only evidence in the record concerning her prior sexual relations was her testimony that she had "gone out" with another person and a report by a doctor that she had attempted intercourse with that person. No offer of proof was made as to the exact nature of her sexual relations with others, or whether such relations could have accounted for her physical condition. The court held the evidence to be insufficient to establish that the victim's physical condition was attributable to the acts of intercourse with others, and that defendant's failure to present additional specific evidence regarding the matter constituted waiver. *Wilder*, 146 Ill. App. 3d at 588-89.

Here, there is less evidence than was the case in *Wilder*. There was no statement from L.F. about having sexual relations with her boyfriend. Nor was there anything in a police report to indicate she had told the police about having intercourse with her boyfriend. The only information before the court was the contradictory statements made by defense counsel in his representation that he would elicit testimony from Officer Patterson that L.F. told him she had sex with her boyfriend, but went on to say that she told him (defense counsel) that the last time she had sex with her boyfriend was "four or so months" prior to the incident. Later, immediately prior to Officer Patterson's testimony, defense counsel added that, if asked, Patterson would state that L.F. told him that she had sex with her boyfriend at noon on March 31. The prosecution, however, said that he was present for that conversation and there was no mention of sex with the boyfriend. Thus it remains unclear what testimony might have been elicited had the defendant been allowed to pursue this avenue of inquiry.

Although the court invited defense counsel to develop the offer of proof outside the presence of the jury through Officer Patterson, counsel declined. Under these circumstances, we find that defendant has waived his contention that he should have been allowed to present this evidence to provide an alternative explanation as to the source of the semen by his failure to present an adequate offer of proof.

Moreover, even where the rape shield statute expressly allows evidence of prior sexual activity by its express provisions, which it does as to past sexual encounters between the alleged victim and the defendant, the statute requires a preliminary showing of "reasonably specific information as to the date, time and place" to be made at an *in camera* hearing before such evidence will be admissible. (Ill. Rev.

Stat. 1989, ch. 38, par. 115—7(b).) No less should be required when the defendant seeks to admit evidence of the victim's sexual conduct with others. Defendant presented no specific information regarding the date, time or place of the alleged sexual intercourse with the boy-friend. The court had only defense counsel's indication that the officer would testify that L.F. told him she had sexual relations with her boy-friend the day of the assault, but the certainty of that testimony was substantially diminished by counsel's own admission that L.F. told him that she last had intercourse with her boyfriend "four or so months" before the assault. Moreover, the prosecutor stated that he had been present when L.F. allegedly made the statement to the police and that no such statement was made.

The lack of certainty in defendant's offer of proof distinguishes the instant case from that of *People v. Gray* (1991), 209 Ill. App. 3d 407, 568 N.E.2d 219, in which the court held that a defendant's right to cross-examine the victim regarding a sexual relationship with an-other superseded the protections of the rape shield statute. There, in an offer of proof, the defendant elicited testimony that the complain-ant told a friend that the defendant had not raped her and that she made up the rape story because she feared she was pregnant by the other man. There was no such offer of proof or testimony here by Of-ficer Patterson as to what the victim allegedly told him.

■ In his brief on appeal, defendant contends for the first time that, in addition to rebutting the medical evidence, this line of ques-tioning was relevant to show L.F.'s bias, interest or motive to testify falsely. (*People v. Campos* (1987), 155 Ill. App. 3d 348, 358, 507 N.E.2d 1342 (defendant is entitled to "fully cross-examine to show bias, interest, or motive").) He suggests that "if [L.F.] had become sexually active and feared her mother's knowledge of her conduct, [L.F.] had bias, interest, and motive to alleged [*sic*] that she had been forcefully assaulted by another man such as [defendant]." This basis for admissibility, however, was not raised below and accordingly has been waived. *People v. Thompson* (1984), 125 Ill. App. 3d 665, 679, 466 N.E.2d 380 (different theory of admissibility than that which was offered at trial may not be argued on appeal).

The third contention raised by defendant on appeal is that he is entitled to a new trial due to comments made by the State in rebuttal, comments which defendant urges impermissibly shifted the burden of proof to the defendant. He claims that the prosecutor, by telling the jury that the defendant has the same right as the State to subpoena witnesses and that the defense could have subpoenaed the emergency

room doctor who treated L.F., implied that the defendant had a burden to prove his innocence.

The State, on the other hand, contends that his issue has been waived for review by defendant's failure to include it with the requisite specificity in his motion for a new trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) In addition, the State argues that in the event we conclude that the issue was not waived, the comments were an invited response to defense counsel's repeated references in his closing argument to the State's failure to call the doctor.

■ Regarding the question of waiver, we agree with the State that defendant's post-trial motion lacks the specificity required to preserve an issue for appeal. In his motion for a new trial, defendant objected generally to "prejudicial, inflammatory erroneous statements in closing arguments." Such a general objection has been held insufficient to preserve an issue for appeal. (*People v. Sargent* (1989), 184 Ill. App. 3d 1016, 540 N.E.2d 981.) However, where the alleged error is one affecting substantial rights, we may consider the issue on appeal, waiver notwithstanding, under the plain error doctrine. (*People v. Young* (1989), 128 Ill. 2d 1, 46, 538 N.E.2d 453.) Because this contention touches upon defendant's fundamental right to be presumed innocent and to have his guilt proven beyond a reasonable doubt, we believe that it should be considered, waiver notwithstanding. *People v. Weinstein* (1966), 35 Ill. 2d 467, 469-70, 220 N.E.2d 432.

It is generally inappropriate for the prosecution to comment on the defendant's failure to call a witness who is equally accessible to both sides. (*Weinstein*, 35 Ill. 2d 467, 220 N.E.2d 432; *People v. Franklin* (1981), 93 Ill. App. 3d 986, 994, 418 N.E.2d 155.) The State, however, is allowed great latitude in closing argument (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 484 N.E.2d 329) and may respond to defense comments which clearly invite response (*People v. Boone* (1988), 180 Ill. App. 3d 98, 534 N.E.2d 1266). When the defense invites comments regarding an absent witness, the comments cannot be relied upon as error on appeal. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 425, 539 N.E.2d 1172. See also *People v. Jennings* (1986), 142 Ill. App. 3d 1014, 1024, 492 N.E.2d 600.) There, as in this case, defense counsel in closing argument pointed to the State's failure to call the physician who examined the victim. The court found no error in prosecutor's remark regarding defendant's failure to call the doctor, stating that "where the defendant has the same access to witnesses, he cannot complain of comments by the prosecutor concerning defendant's ability to call these witnesses when he invited or provoked such comment."

Moreover, even were we to determine that the State's remarks were improper, we would conclude that reversal is not warranted. Unless improper remarks result in substantial prejudice to the defendant, reversal is not required. (*People v. Caballero* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089.) "If the prosecutor's remarks were such that, had they not been made the jury may have reached a different result, then the error is prejudicial." *People v. Mullen* (1990), 141 Ill. 2d 394, 407, 566 N.E.2d 222.

As discussed above, we have found the evidence presented at trial to be amply sufficient to support the verdict. There simply was no evidence presented on the question of injury to L.F. The defense pointed out this deficiency in its closing arguments, and the State responded. The State did not repeat the comment nor did it dwell on the issue. In addition, the court correctly instructed the jury as to the burden of proof and the defendant's presumption of innocence. As a result, we cannot say that the result would have been different had these comments not been made.

The cases upon which defendant relies are not on point. In *People v. Weinstein*, 35 Ill. 2d 467, 220 N.E.2d 432, the prosecutor repeatedly and explicitly told the jury that it was defendant's burden to present evidence creating reasonable doubt. The court found that the defendant was manifestly prejudiced by these repeated erroneous assertions. In *People v. Lopez* (1987), 152 Ill. App. 3d 667, 679, 504 N.E.2d 862, the State in rebuttal argument named 11 people who might have provided the defendant with an alibi. The court found that the remark "[w]here are those people that can clear the defendant" constituted an impermissible shifting of the burden, which resulted in substantial prejudice to the defendant. As discussed above, we find no such prejudice here.

■ Regarding defendant's final argument, *i.e.*, that the State's questioning of Sadie Fulwiley on redirect regarding the photographs of her house had the effect of making the prosecutor a witness and was unfair and prejudicial, defendant failed to object to the questioning at trial or to raise the issue in his post-trial motion and, as a result, has waived the issue on review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Moreover, even were the issue not waived, we find it to be without merit. The prosecutor did not take the stand, in contrast to what occurred in *People v. Janes* (1985), 138 Ill. App. 3d 558, 486 N.E.2d 317, cited by the defendant. Here the defendant, on cross-examination of Sadie Fulwiley, brought out the fact that the pictures were taken by the prosecution. The State was simply clarifying the issue on redirect, which it had the right to do.

*(People v. Miller* (1978), 58 Ill. App. 3d 156, 373 N.E.2d 1077.) Further, the defendant has not explained, nor can we conceive, how these questions regarding who took the pictures of the complainant's house have resulted in prejudice to the defendant. *People v. Janes*, 138 Ill. App. 3d 558, 486 N.E.2d 317.

Accordingly, for all the above reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY, P.J., and MURRAY, J., concur.