2021 IL App (2d) 180542-U
No. 2-18-0542
Order filed March 15, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-369 |
| JESUS AVILAS, | ) ) | Honorable Timothy J. McCann, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant was proven guilty beyond a reasonable doubt of two counts of criminal sexual assault and he was not denied his right to effective assistance of counsel in the presentation of his defense; affirmed.

¶ 2    Following a bench trial, defendant, Jesus Avilas, was found guilty of two counts criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2014)) and sentenced to two consecutive 5-year terms. On appeal, he contends that the evidence was insufficient to sustain his conviction and that his attorney was ineffective. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4   Defendant was arrested following an incident on March 28, 2014, which occurred at the U.S. 30 Motel in Aurora. There, according to the victim, M.M., defendant forcibly placed his penis into both her mouth and her anus. Defendant asserted these acts were consensual.

¶ 5   Prior to trial, defendant filed a motion *in limine* seeking to introduce evidence of M.M.'s prior sexual activity as an exception to the rape-shield statute. 725 ILCS 5/115-7 (West 2014). Specifically, defendant sought to introduce evidence that M.M. made a statement to hospital personnel denying that she had vaginal intercourse with her boyfriend in the 72 hours preceding her sexual-assault examination. The trial court denied the motion but held that it would revisit the issue at trial if M.M. denied having a boyfriend while testifying at trial. In addition, defendant filed a separate motion to introduce evidence that he and M.M. had consensual vaginal intercourse approximately one week before the assault. The trial court granted that motion.

¶ 6   At trial, M.M., who spoke only Spanish, testified through an interpreter. M.M. was either 19 or 20 years old at the time of this incident and was not lawfully present in the United States. Back in 2014, M.M. was working at a temp agency, where she met defendant whom she knew as "Carlos." M.M. knew defendant for about a week through work. On March 27, 2014, M.M. mentioned that she needed to borrow $400 to bring her daughter to the United States from Mexico. Defendant told M.M. that he would lend her the money and he arranged to meet her at a Dunkin' Donuts near her house the following day. On March 28, 2014, defendant met M.M. in the morning and told her to get in his car; "[h]e said that [they] were going to go to the bank to take the money, so that he could give it to [her]" and then he would drive her home. Defendant did not take M.M. to a bank. Instead, defendant drove M.M. to a location that she later identified as the U.S. 30 Motel in Aurora.

¶ 7    Defendant exited the car and locked the doors. M.M. stated, "I didn't know what that place was. So, he walked out somewhere and I don't know what it was. I don't know where he went." Defendant returned to the car and told M.M. to exit the vehicle. Then he grabbed her by the arm and walked her to one of the rooms. M.M. did not see anyone else in the area to call to for help. M.M. explained that she went along with defendant "[b]ecause he said that he was going to take me to go get the money, and I didn't know where that place was to go get the money, so I didn't know."

¶ 8    Once inside the hotel room, defendant became violent. She felt trapped in the room with him. Defendant then grabbed M.M. by the arms, pulled her hair, kissed her, and yelled at her to take off her clothes. Defendant took off his clothes and forced M.M. onto the bed. Defendant then put his penis in her mouth, in her vagina, and in her anus. M.M. explained: "When he was -- when he put his penis in my anus, he put his hand over my mouth because I wanted to scream, and he didn't let me. He covered my mouth, and he was pulling my hair at the same time." M.M. further stated that she repeatedly wanted to yell for help, but defendant covered her mouth, told her not to scream, and pulled her hair. At some point, defendant ejaculated on M.M.'s lower back. M.M. stated that she did not consent to any sexual act with defendant.

¶ 9    Afterwards, defendant told M.M. the following: "He said he had contacts here, and that if I would say anything of what had happened, that something bad would happen to me. *** He threatened my daughter [in Mexico] and my family as well. *** He said that he was going to hurt us and kill us." M.M. estimated they were in the hotel room for around two hours. Defendant told M.M. to get dressed and they got back in the car. During the car ride, defendant told M.M. that they should keep this between the two of them. Defendant told M.M. that he was going to pay M.M. "to be his bitch." Defendant stopped off at a bank and went inside, but did not bring M.M.

any money. M.M. said nothing. She stayed totally quiet. She testified that she was not upset that defendant did not give her the money. Instead, she said she acted like she didn't exist and just wanted to go home and get away from defendant. Defendant took her to the Dunkin' Donuts and dropped her there.

¶ 10    When M.M. returned home, she did not want to contact the police and she was in considerable pain. M.M. called a friend and M.M. said she "wanted to take [her] life by cutting [her] veins." M.M.'s friend called the police, and M.M. was taken to the hospital where she was examined and treated. Finally, M.M. testified that she did not remember having any interaction or text messages with defendant after the incident at the motel.

¶ 11    On cross examination, M.M. explained how she came to ask defendant for financial help while the two were at work:

> "When I told him about my daughter * * * he offered to help with no conditions at
> all. And he offered to help me, and that's why I asked him for the money, because he said
> he also had a daughter, and that he would not want anything to happen like that, like [what]
> was happening to mine."

M.M. further explained that she did not know that defendant had taken her to a motel instead of a bank because she had just come to the United States, and initially she did not know what a motel looked like:

> "Now, I do. Now, I do, because I come from a place where everything was pretty
> much the same. There was no differences in places. I just came here, and after this
> happened, I was able to see that. But because of my knowledge, I don't know what some
> places look like. I felt like a little dumb, but I just don't know what some locations may
> look like compared to the place where I come from."

¶ 12    In addition, on cross-examination, M.M. confirmed that she told one of the officers that defendant removed her clothes as opposed to saying that she removed her own clothes. She also said that it had been nearly four years since the interview and the trial so she was not certain what was said. M.M. also explained why she did not call for help in the hotel room:

> "Q. At no time in between these different sexual acts did you try to scream or get anyone's attention, correct?
>
> A. He had my mouth covered.
>
> Q. The whole two hours?
>
> A. Not the whole two hours, but he was pulling by my hair, and he was -- I was afraid he was going to hit me besides everything that he was already doing to me."

Finally, when defendant was unable to take out any money from the bank, he told M.M. he would give her the money, not loan it to her, because he wanted "[her] to be his bitch."

¶ 13    A nurse, Amy Wright, testified that she administered a sexual assault kit and collected evidence from M.M.'s body on March 28, 2014, at Presence Mercy Medical Center in Aurora.

¶ 14    Dr. Laurel Kietzman was the emergency room physician that night and had received basic training, during her residency, on sexual assault examinations. Kietzman noted that M.M. had abrasions on her left wrist and three tears from the entrance of the vagina towards the cervix. In addition, Kietzman found an abrasion near the center of M.M.'s cervix. Kietzman opined that the tears she observed were "fresh"—as in, within a matter of hours—because the vagina heals quickly. Kietzman observed no other injuries to M.M. On cross-examination, Kietzman confirmed that it is possible to have normal, consensual intercourse that results in some physical trauma, as well as non-consensual intercourse that leaves no sign.

¶ 15     The parties stipulated that a DNA swab taken from M.M.'s lower back was positive for defendant's semen. In addition, DNA from a vaginal swab was positive for semen from an unidentified male profile.

¶ 16     Theo Manikas, the owner of the U.S. 30 Motel, testified that the motel was a ten-room, L-shaped structure. Manikas confirmed that a motel registration card had been issued to "Carlos Mendoza" for Room 8 on March 28, 2014 at 10:38 a.m. Manikas also identified a person in a screenshot from a surveillance camera, taken from another date, as the person he knew as Carlos.

¶ 17     Detective Mitchell Hattan testified that he investigated the case for the Kendall County Sheriff's Office. Hattan spoke to M.M. through an interpreter and drove M.M. around until she was able to identify the location of the assault: the U.S. 30 Motel, Room 8. Hattan spoke to the manager and obtained the receipt for the room from March 28, 2014. Using car registration records, Hattan determined what type of vehicle defendant had registered; Hattan showed M.M. a picture of a similar car, and M.M. identified it as being similar to defendant's car. Hattan also took a screenshot of defendant from the motel's security camera feed. Hattan showed the picture to M.M., who identified defendant as her attacker.

¶ 18     On August 11, 2014, Hattan was contacted by the manager of the U.S. 30 Motel who said that "Carlos" was at the motel and had rented a room. Hattan and another deputy went to the hotel and spoke to defendant (in English). Defendant identified himself by name and explained that "Carlos Mendoza" was an alias he had used. Hattan and the other deputy spoke to defendant for approximately 40 minutes at the motel. The interview was recorded with defendant's permission, and the audio recording was played in court. During the interview, defendant repeatedly denied that he knew M.M. and denied assaulting her. Defendant stated that he was married but frequented the motel for his extramarital rendezvouses. Defendant often used the alias "Carlos" so that his

wife would not find out about his affairs. Before the interview concluded, defendant agreed to submit a buccal swab.

¶ 19    On cross-examination, Hattan confirmed that he did not speak Spanish, and only spoke to M.M. through interpreters. Hattan also testified that when he interviewed defendant at the U.S. 30 Motel, defendant answered the door wearing only a towel and an unidentified woman was initially present in the room. Defendant got dressed and the woman left while defendant spoke to the police. On redirect, Hattan testified that M.M. was initially unsure of where the motel was. They did not take a "direct route" from M.M.'s apartment. However, once M.M. identified some landmarks, she was able to direct them to the motel with "little difficulty." The State rested and defendant's motion for a directed verdict was denied.

¶ 20    Defendant called Deputy Jennifer Larsen, who testified that she met with M.M. at the hospital on March 28, 2014. Larsen said that she was not a fluent Spanish speaker. According to Larsen, M.M. stated that defendant had removed her clothes, not that he had ordered her to remove them herself. M.M. told Larsen that defendant had "threatened to kill her and her family if she had told anybody about it." M.M. said that, after the assault, she washed herself from the waist down and "ended up slitting her wrists because she did not want to live anymore." M.M. did not want any photographs taken of her at the hospital.

¶ 21    Deputy Nancy Velez testified that she was fluent in Spanish and translated for Hattan when he interviewed M.M. on May 5, 2014. M.M. did not want the interview recorded. According to Velez, M.M. told Hattan that she had not previously arranged to meet defendant the morning of March 28, 2014. M.M. stated that she had known defendant for a month before the morning when he pulled into the parking lot and offered her a ride; then, he took her to the motel. According to Velez, M.M. was never asked if she had any communication with defendant before March 28th.

On cross-examination, Velez agreed that not every word or phrase translates precisely from Spanish to English or vice versa. Velez also further stated that she did not recall the precise words M.M. used in Spanish from the interview three years earlier.

¶ 22 By stipulation, the parties introduced evidence showing that M.M. sent three text messages to defendant's phone at 12:29 a.m. on March 29, 2014. (The substance of those text messages was never introduced.) The parties further stipulated that two Aurora police officers would testify that they responded to a wellbeing check at M.M.'s apartment at around 2 p.m. on March 28, 2014. The officers would testify that M.M. told them that she contacted "Carlos" the day before and asked him to lend her $500; "Carlos" picked her up at 9:00 a.m. the following morning to take her to a bank; instead, he took her to a motel, took off her clothes, and raped her. M.M. further stated that she believed "Carlos" used a condom during intercourse. Afterwards, "Carlos" dropped M.M. off at the Dunkin' Donuts, which was near both her apartment and the Aurora Police Department. M.M. did not go home. Instead, she went into the police station to report the rape but saw a man in the lobby that she thought was "Carlos" and left.

¶ 23 Defendant testified that he was married with one daughter. Defendant testified that he met M.M. when she was walking across a street in Aurora a week or two prior to the incident at the hotel. Defendant offered M.M. a ride to the employment office; she went inside and came out about 10 to 15 minutes later. Then defendant drove her to a park near the Aurora police station. In the car, they talked and had sex. Then, they exchanged phone numbers, and M.M. exited the car and walked home.

¶ 24 The day before they went to the motel, M.M. texted defendant and asked him for $1000. He said he could not do that, but he could give her $500. According to defendant, they made plans the following day to "[m]eet at the motel, and from the motel, go to the bank."

¶ 25    Defendant testified he picked M.M. up the following morning in a different vehicle and that the driver's side door did not work; so, the passenger side door was the only method of entry and exit. Defendant then stated that they first went to the Motel 6; M.M. waited in the car, but the hotelier would not rent them a room without identification from M.M. When M.M. told defendant she did not have any ID, defendant drove to the U.S. Route 30 Motel. There, defendant rented a room under his alias "Carlos Mendoza" so that his wife would not find out. He had previously used the same alias and rented a room at the same motel with another woman.

¶ 26    Defendant testified that they walked to the motel room that he rented and he did not place his hands on M.M. at all as they walked. Once inside the room, they sat on the bed, talked, and then had consensual oral, vaginal, and anal sex. Afterwards, defendant returned the hotel key to the front desk, and he and M.M. drove off. Defendant drove them to a bank but was unable to take out any money. Then he drove M.M. home. Defendant said M.M. was angry that he had not been able to take out any money from the bank. Several days later, defendant stated, M.M. threatened that she would call the police and make a report if he did not give her the money.

¶ 27    As noted, defendant was eventually interviewed at the motel and then later arrested. Defendant testified that he repeatedly told the police he did not know M.M. or have sex with her because he was afraid that the admission would destroy his marriage.

¶ 28    After closing arguments the trial court entered a written six-page ruling finding defendant guilty of both counts of aggravated criminal sexual assault. The trial court's findings rejected each of the arguments and claimed inconsistencies in the evidence that had been advanced by defendant. The trial court noted that there were some language barriers in M.M.'s testimony, but more or less accepted her account as completely credible while it rejected defendant's testimony as simply not

believable. The court denied defendant's post-trial motion and sentenced defendant to consecutive five-year terms for each of the two counts. This appeal follows.

¶ 29                                   II. ANALYSIS

¶ 30    On appeal, defendant contends that there was insufficient evidence to sustain his convictions and that his attorney was ineffective for failing to introduce evidence of M.M.'s recent sexual activity with another man. We find neither contention availing.

¶ 31    We first address the sufficiency of the evidence. The State carries the burden of proving beyond a reasonable doubt each element of an offense and, where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. *Jackson v. Virginia,* 443 U.S. 307, 315-19 (1979). Under this standard of review, it is the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009).

> "When considering a challenge to the sufficiency of the evidence, it is not the function of a reviewing court to retry the defendant. [Citations.] Rather, in a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. [Citations.] A reviewing court will not reverse a conviction simply because the evidence is contradictory [citation] or because the defendant claims that a witness was not credible [citation]." *Id.* at 228.

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id*. at 225.

¶ 32      Despite the trial court's findings, defendant's primary argument is that M.M.'s testimony was "unconvincing." Ultimately, nothing defendant points to renders M.M.'s testimony wholly unworthy of belief. For example, defendant points out that he and M.M. exchanged dozens of text messages prior to the assault. None of those messages were introduced at trial, but according to defendant, from the fact that they were texting, standing alone, "the inference is that they were forming an intimate connection and making plans to meet." That, simply put, is a whole lot of speculation. At any rate, even if M.M. and defendant exchanged text messages about meeting at Dunkin Donuts, that fact would not compel the inference that M.M. consented to sexual intercourse generally, or consented to oral and anal sex specifically.

¶ 33      Defendant next challenges M.M.'s testimony that she believed defendant had taken her to a bank and that she did not initially know that he had taken her to a motel. Defendant notes M.M.'s testimony that she did not scream when defendant took her out of the car and led her to the room because he told her not to. According to defendant, "[i]f she truly had believed the 'U.S. 30 Motel' was a bank, there would have been no reason to scream." Defendant asks us to take judicial notice of a GoogleMaps picture of the building attached to his appellate brief to support his assertion that "[M.M.] entered the motel room to have sex with [him]." Here, too, we find nothing inherently improbable in M.M.'s testimony. M.M. may have believed the building was a bank, or that the building was next to the bank, or that defendant would retrieve the money from an ATM machine at the motel. Even setting aside the fact that defendant may have led M.M. by the arm from the car to the motel room, M.M. may well have not known there was anything wrong until she was inside the motel room itself. Indeed, defendant may not have known what he would do or how far he was willing to go prior to the moment of assault. In any event, no principle of law requires a victim to be supremely aware of her surroundings or cognizant of her attacker's intentions prior to being

assaulted.

¶ 34    Finally, defendant argues that there was insufficient evidence that he used force or threatened M.M. during the assault. Defendant notes that M.M. stated that once she was inside the room, she felt trapped and wanted to yell for help but never did even though she stated that defendant grabbed her hair. According to defendant, "[t]here [was] no evidence that [M.M.'s] scalp was red from her hair being pulled, or that her mouth was raw from being forced to perform oral sex."

¶ 35    "The force element of rape does not depend for its proof on actual physical damage to bodily tissue, however, [citation] and a rape victim is not required to subject herself to serious physical harm by resisting in order to establish that intercourse was nonconsensual." *People v. Nelson*, 148 Ill. App. 3d 811, 820-21 (1986). Moreover, "proof of physical force is unnecessary if the complainant was paralyzed by fear or overcome by the superior strength of her attacker." *Id.* at 820 (1986) (citing *People v. Faulisi*, 25 Ill. 2d 457 (1962)). In addition, a reviewing court may consider intangible factors which may have contributed to the force or threat of force perceived by the victim, such as the seclusion of the area in which the assault occurred, the victim's lack of familiarity with the area, the presence or absence of others, physical disparities between the victim and the defendant, the age difference between the two, and whether the defendant was able to assert himself over the victim due to her legal status. See *Nelson*, 148 Ill. App. 3d at 822 (upholding finding of force where, *inter alia*, defendant knew that the victim was a runaway and that the police were looking for her).

¶ 36    Based on the evidence at trial, these factors do not favor defendant. Taking the evidence in the light most favorable to the State, as we must, defendant lured the victim, an undocumented immigrant, to a secluded, unfamiliar area in his car (a motel, in the United States), used aggression

to remove her from his car, lead her to a more secluded area (the motel room), and forcibly committed acts of sexual penetration upon her while she was terrified. On balance, we determine that the circumstances of these offenses support the trial court's finding that defendant committed the charged sex acts using the force or threat of force.

¶ 37    To the extent defendant claims M.M. was not terrified, or was not as terrified as she stated, we find his argument belies belief. Again, as our supreme court has noted, "We cannot accept this challenge to the sufficiency of the evidence. It remains the firm holding of this court that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *Siguenza-Brito*, 235 Ill. 2d at 228. M.M.'s testimony as observed by the trial court was positive and credible; meanwhile, defendant has failed to point to any serious inconsistencies that would render M.M.'s testimony fanciful or unworthy of belief. Accordingly, like the trial court, we determine there was sufficient evidence to find defendant guilty of both offenses.

¶ 38    Defendant's second contention is that his counsel was ineffective for failing to introduce evidence of M.M.'s recent sexual activity during defendant's case in chief—specifically, evidence regarding the male source of the unidentified semen found in M.M.'s vagina. According to defendant, had counsel done so, the evidence would have provided an alternative explanation for M.M.'s vaginal injuries, which *might* have lead to the inference that M.M.'s sex with defendant was consensual. As we explain, by defendant's own concession, the evidence was inadmissible, making this issue something of a tempest in a teapot.

¶ 39    Claims of ineffective assistance are subject to the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). This means that a defendant must show that (1) "his attorney's assistance was objectively unreasonable under prevailing professional norms" and (2) "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The defendant bears the burden of persuasion under both prongs of *Strickland*, and we may reject an ineffective assistance claim in its entirety based on such a failure.

¶ 40    The rape shield statute provides that in a prosecution for criminal sexual assault:

"the prior sexual activity or the reputation of the alleged victim or corroborating witness * * * is inadmissible except (1) as evidence concerning the past sexual conduct of the alleged victim or corroborating witness under Section 115-7.3 of this Code with the accused when this evidence is offered by the accused upon the issue of whether the alleged victim or corroborating witness under Section 115-7.3 of this Code consented to the sexual conduct with respect to which the offense is alleged; or (2) when constitutionally required to be admitted." 725 ILCS 5/115-7(a) (West 2014).

Under the exception for evidence that may be "constitutionally required," prior sexual activity of the alleged victim is admissible if it enables a criminal defendant a meaningful opportunity to present a complete defense to the charged offenses. *People v. Santos*, 211 Ill. 2d 395, 412 (2004); see also *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 42.

¶ 41    Because of the importance of the rights at stake, a criminal defendant invoking this exception to rape shield faces a steep hill and the defendant has the burden of providing an adequate offer of proof to the trial court. *People v. Patterson*, 2014 IL 115102, ¶¶ 118, 123; *People v. Grant*, 232 Ill. App. 3d 93, 103 (1992). Our supreme court has explained that "[t]o preserve a claim on appeal, a party is required to make 'considerably detailed and specific' offers of proof after a denial of a request to admit evidence if the substance of the witness's answer is unclear." *Patterson*, 2014 IL 115102, ¶ 118 (quoting *People v. Peeples*, 155 Ill. 2d 422, 457

(1993)). A specific offer of proof is required where a defendant alleges that the victim engaged in similar sexual contact with a third party. *Grant*, 232 Ill. App. 3d at 103-05 (defendant sought to introduce evidence that victim had prior sexual relations with a boyfriend but did not put forth an adequate offer of proof with specific information regarding the date, time, or location of alleged sexual contact). The rape-shield statute requires such details when the prior conduct occurred between the victim and the defendant, and no less is required when the defendant seeks to admit evidence of the victim's sexual contact with others. See *Grant*, 232 Ill. App. 3d at 104-05.

¶ 42    As an initial matter, based on the holding in *Grant*, we find that defendant's offer of proof was far too vague to merit serious consideration as admissible evidence, let alone that it would have formed a cornerstone of defendant's trial defense. In addition, as the State points out, defendant's brief concedes that his offer of proof was so insufficient that his purported evidence could not even meet the most basic standard for introduction: relevance. See Ill. R. Evid 403 (eff. Jan. 1, 2011). As defendant notes:

> "Arguably, the court and [the] State were correct that M.M.'s sexual activity with another man, who may or may not have been her boyfriend, *was not relevant to the question of whether her sexual activity with Avilas was consensual*. Also, the fact that M.M. may have lied to the police and medical examiners about not having sex with anyone other than Avilas during the preceding 72 hours was not necessarily admissible to impeach her credibility. See *People v. Santos*, 211 Ill. 2d 395, 405-06 (2004) (alleged victim's past sexual conduct was a collateral matter so her prior inconsistent statements about that matter was not admissible for impeachment purposes)." (Emphasis added.) Def. Op. Br. p. 41.

As defendant concedes, his evidence cannot clear the hurdle of relevance, it is axiomatic that it also cannot clear the high bar that it was constitutionally required to be admitted.

¶ 43    Finally, before concluding we note that the charges in this case pertained to the anal and oral, and not vaginal penetration. Although as we noted above, M.M.'s testimony clearly established the essential elements of the charged offenses, she also gave a thorough account of defendant's forcible vaginal penetration as well. Surely, it cannot be defendant's contention that in order to bolster the negligible relevance of M.M.'s prior sexual conduct with another man, defendant would have welcomed prosecution on a third sexual assault charge stemming from the same incident. For these reasons, we determine that defendant suffered no prejudice and that counsel was not ineffective for failing to introduce defendant's proffered evidence.

¶ 44                                    III. CONCLUSION

¶ 45    In sum, we affirm defendant's convictions and sentences, as well as the judgment of the Circuit Court of Kendall County.

¶ 46    Affirmed.