(No. 25324.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PATRICK J. BILLINGS, Plaintiff in Error.

*Opinion filed December 15, 1939.*

434

CHARLES A. BELLOWS, (J. W. BELLOWS, of counsel,) for plaintiff in error.

JOHN E. CASSIDY, Attorney General, THOMAS J. COURT-NEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, BLAIR L. VARNES, and JULIUS L. SHERWIN, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Patrick J. Billings and Rose Marie Gennarelli were both indicted in the criminal court of Cook county on a charge of conspiracy to cheat and defraud certain parties of money and personal property by false pretenses, and to embezzle and convert to their own use certain interest coupons and divers checks. Rose Marie Gennarelli was allowed a severance and testified on behalf of the People. A jury found Billings guilty and fixed his punishment at imprisonment in the penitentiary for one year and a fine of $1000. He was sentenced on the verdict, and the judgment was affirmed by the Appellate Court for the First District. He has prosecuted a further writ of error from this court to review the proceedings.

Rose Marie Gennarelli was twenty-eight years old and was employed by the Securities Service Corporation. She testified her duties were to handle bonds of the Book-Cadillac Hotel properties under a reorganization plan, and the 6901 Oglesby Avenue Apartments bond-issue activity; that she met Billings at a ball room in April, 1936, and thereafter saw him three nights a week; that he proposed

marriage and they became engaged; that he ascertained from her the nature of her duties, informed her he had worked in the "movies" in Hollywood, California, for six years, and stated he had money on the coast and the monthly income from a trust fund of $150,000 left by his father but could not get hold of any money just then, and procured a loan of $200 from her which she advanced out of her savings; that subsequently she loaned him another $150, the remainder of her savings; that later, he asked for more money, and when she told him she had no more, he asked her to cash coupons at the office, which she declined to do; that he told her if she did not want her parents to know of the loans she had made him, she had to help him get money from the office, promising to pay it back immediately upon returning from Detroit, where he said he had an offer of a job; that she cashed $100 in coupons of the 6901 Oglesby Avenue Apartments and gave him the money; that thereafter, from time to time, she cashed other securities she handled, and fraudulently procured the signature of her superior to divers checks made out to Billings, all of which he received, a part of the money and checks being sent to him when he went back to California; that he promised to repay these amounts and to take the blame if it was found out.

On cross-examination Miss Gennarelli testified that when she refused to procure the first $100 from the office she was thinking of her parents; that they do not think it is right for a woman to give a man money; that the only way she could show Billings she loved him was by giving him money when he asked for it, and she was willing to steal for him; that when she took the first $100 and he was making further demands she told him she did not want to do it; that he told her she had to do it and forced her against her will; that her subsequent stealings were because of his threats and not because of any agreement; that while he was in California he made demands for

money accompanied each time by a threat, one of which was that he would tell her parents of the loans of her own money and that she was taking money from the company for him. She further testified that the money she sent him in 1937 was because she was afraid of him, and was not of her own free will. Billings admitted procuring money from her, but denied knowing she was taking it from her employer, and testified she told him that she had received considerable money from an accident. She denied telling him anything of that kind.

The first ground urged for reversal is that the offense of conspiracy was not established because a conspiracy is in the nature of a contract; that where one does an act through coercion of another, it does not amount to an agreement between the parties, and that the testimony of the People shows there was no such agreement.

When Billings obtained the first $100 taken from the company's office, the only threat or means used to induce her to take the money, to which she testified, is that Billings said he would tell her parents she had loaned him money of her own. She had a right to lend him her own money if she desired, and she could not be subjected to any penalty for doing so. She was under no duress when he made the threat. The most that could have happened would be the disapproval by her parents of a legal and innocent transaction. Her testimony that she was unwilling and was forced to do it refers only to her reluctance to have her parents know she had loaned him her own money. According to her testimony her love for him overcame her reluctance to the extent that she was willing to steal for him. In order to prove conspiracy it was not necessary to prove the motive of each party was the same. The motives by which the parties are actuated may be most diverse. The love of one party for the other, sufficient to cause her to steal for him, and the desire of such other party to thereby obtain money illegally, would be such a

combination of motives as constitutes a conspiracy, even though Miss Gennarelli received no financial benefit. (*Attorney General* v. *Tufts*, 239 Mass. 458, 132 N. E. 322.) The essence of a conspiracy is not the accomplishment of the unlawful design, but it is the unlawful confederation or agreement to accomplish the criminal or unlawful purpose. It is not necessary to prove any overt act or that the conspirators agreed, in terms, to pursue the common design. It is only necessary to show that they, either by acting together or separately, pursued a course tending to accomplish such common unlawful design. The offense is complete when the unlawful combination or agreement is made. (*People* v. *Cohn*, 358 Ill. 326; *People* v. *Drury*, 335 id. 539.) Therefore, the conspiracy, if entered into, was complete when the first $100 was stolen. The testimony of the People does not show coercion. Subsequent overt acts of embezzlement would constitute a continuance of the original conspiracy, already complete. (*People* v. *Drury, supra; People* v. *Blumenberg*, 271 Ill. 180.) A more drastic threat made later could have no effect upon it. The contention that the testimony of Miss Gennarelli is insufficient in law to show a conspiracy is untenable.

In order to lay a foundation for impeaching Miss Gennarelli, she was asked on cross-examination if she had a telephone conversation with Billings on November 18, 1937, and, in detail, if Billings asked her certain questions to which she made certain answers, all of which she denied *seriatim*. The alleged telephone conversation purported to show that she told him the checks she sent him were her bonds transferred to his name and that she did not tell him the money was stolen, and that she said if she did not put the blame on him her brother would kill him. At the outset of this part of the cross-examination, the People objected to it, unless it was backed by proper proof. Counsel for Billings stated that he would prove the conversation by the testimony of an official reporter of the court, whereupon the cross-examination proceeded.

Billings testified that he had a telephone conversation from the office of a Chicago lawyer with Miss Gennarelli at her home on November 17, and identified her voice; that the next day, at the same place, he had another telephone conversation with her; that Mrs. Charters, the court reporter, was in the adjoining room at an extension telephone, and other persons were present. He detailed the substance of the conversation similar to the questions and answers propounded to Miss Gennarelli on cross-examination. Mrs. Charters testified she took down the conversation in shorthand. She was unable to identify the voice she heard as that of Miss Gennarelli and was withdrawn as a witness by defendant's counsel, without any offer to show the questions and answers. Three other witnesses testified there was a telephone conversation at that time and place by Billings, but none of them identified the voice of Miss Gennarelli.

After the close of the testimony for Billings, the State's attorney stated to the court: "I have a motion to make in the presence of the jury and that motion is based upon counsel's promise that he would prove in open court certain things, which he hasn't thus far been able to do. I move now that all the questions asked of Miss Gennarelli in the way of impeachment, she not having been impeached, be stricken and the answers thereto stricken and the jury instructed to disregard it." Counsel for defendant stated that Billings testified the conversation did take place, to which the State's attorney replied: "He said he would impeach her by the court reporter," whereupon the court struck the testimony.

The claim that the court reporter was prevented from testifying to the alleged questions and answers is untenable. No offer to prove them by her was made. Billings claims that the statements of the State's attorney, above quoted, and striking the impeaching questions and answers, operated to his prejudice. Although his counsel stated he would prove the conversation by a court reporter, and did not

prove it by that particular witness, he was not limited to that witness to impeach Miss Gennarelli.· Even if the court reporter had testified adversely to Billings, he would not be prevented from presenting other impeaching evidence. Four witnesses, including the court reporter, testified that Billings held a telephone conversation with some person at the time and place mentioned, and Billings testified he was talking with Miss Gennarelli.

The defendant had the benefit of all this testimony. He would have been in no better position if the impeaching questions and answers asked of Miss Gennarelli had not been stricken, because each of those questions asked of her on cross-examination received a negative answer. If the cross-examination on this point had been permitted to stand, the jury would have had before it her denial of the conversation and her denial of its details, whereas, when it was stricken, the jury had only the testimony of the defendant on this point. We are of the opinion the defendant was not prejudiced by striking the impeaching questions and answers.

The court gave the jury an instruction in the language of the statute that whoever embezzles or fraudulently converts to his own use, money or property delivered to him which may be the subject of larceny, shall be deemed guilty of larceny. This instruction did not direct a verdict. Other instructions fully instructed the jury as to the charge of conspiracy. The charge was a conspiracy to embezzle, and there was no prejudice in merely defining one of the elements comprising the offense.

Another instruction had relation to all who enter a conspiracy after it is formed. While it had no application here, we fail to see how defendant was prejudiced by giving it. An instruction told the jury that if it found the defendants or any of them guilty in manner and form as charged in the indictment, the form of the verdict may be: "We, the jury, find the defendant (naming him) guilty of

conspiracy," etc. A similar instruction as to a not guilty verdict was given. It is complained these two instructions were confusing and misleading because the defendant was the only one on trial. The jurors were aware of that fact and there could be no confusion in their minds about it.

A police officer was asked whether he knew the reputation of Billings for truth and veracity. The proper inquiry should have been whether the witness knew the general reputation of the defendant for truth and veracity in the neighborhood where he .resided, but no specific objection was made to the question. The general objection interposed is not a sufficient basis for complaining here that the inquiry did not embrace general reputation. The cross-examination of the officer does not show, as claimed by defendant, that the testimony was based on his own opinion rather than defendant's general reputation.

The trial judge encouraged frivolity on the part of counsel for both sides, and the assistant State's attorney indulged in improper remarks. To some extent, defendant's counsel did the same thing. A trial should be conducted without prejudicial conduct of counsel and with the dignity and solemnity that is required in passing upon the question of a defendant's guilt or innocence. While the facts shown as to such conduct are not to be commended, but deserve criticism, they do not show that defendant did not have a fair trial.

The jury heard the evidence and had an opportunity to observe the witnesses while testifying and to judge of their credibility. The testimony of the prosecution was sufficient for a conviction, and, in such a case, we will not disturb the verdict.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*