# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Maxwell, 2011 IL App (4th) 100434**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONNIE ANDRE MAXWELL, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-10-0434 |
| Filed | December 6, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for predatory criminal sexual assault, criminal sexual assault and aggravated criminal sexual abuse, the appellate court held that the trial court did not err in prohibiting defendant's counsel, in light of medical evidence showing penetration, from cross-examining the State's medical expert about whether that evidence could have resulted from the victim having had intercourse with someone other than defendant, that defendant's guilt was established beyond a reasonable doubt, and that the children's advocacy center assessment should be vacated as an *ex post facto* punishment. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 08-CF-327; the Hon. Robert L. Freitag, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded with directions. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Duane E. Schuster, all of State Appellate Defender's Office, of Springfield, for appellant.

William A. Yoder, State's Attorney, of Bloomington (Patrick Delfino, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices Steigmann and Knecht concurred in the judgment and opinion.

## OPINION

¶ 1     A jury found defendant, Donnie Andre Maxwell, guilty of two counts of predatory criminal sexual assault, three counts of criminal sexual assault, and one count of aggravated criminal sexual abuse. The trial court sentenced him to consecutive terms of imprisonment on each conviction, aggregating to 54 years of imprisonment.

¶ 2     Defendant appeals on the following grounds. First, he argues that the trial court violated his constitutional right to confront adverse witnesses in that the court prohibited defense counsel from cross-examining the State's medical expert on whether the physical evidence of sexual penetration could have resulted from sexual intercourse with someone other than defendant. We find no abuse of discretion in this respect, considering that defendant failed to make the offer of proof required by subsection (b) of the rape-shield statute (725 ILCS 5/115-7(b) (West 2010)).

¶ 3     Second, defendant argues the State failed to prove him guilty beyond a reasonable doubt. When we view the evidence, however, in a light most favorable to the prosecution, we conclude that a rational trier of fact could find the elements of the charged offenses to be proved beyond a reasonable doubt.

¶ 4     Third, defendant argues that a children's advocacy center assessment in the amount of $15 should be vacated as an *ex post facto* punishment. The State agrees, and so do we.

¶ 5     Therefore, we affirm the trial court's judgment in part and vacate it in part. We vacate the children's advocacy center assessment and remand this case with directions to amend the sentencing judgment accordingly. Otherwise, we affirm the judgment.

¶ 6                                  I. BACKGROUND
¶ 7                                  A. The Indictment
¶ 8     On March 28, 2008, a grand jury returned an indictment against defendant. The indictment consisted of six counts, and the alleged victim in all counts was V.M. The first

two counts charged defendant with committing predatory criminal sexual assault (720 ILCS 5/12-14.1(a)(1) (West 2000); 720 ILCS 5/12-14.1(a)(1) (West 2002); 720 ILCS 5/12-14.1(a)(1) (West 2004)) during the period of February 24, 2000, through September 4, 2004. Count I alleged penis-to-vagina penetration, and count II alleged penis-to-mouth penetration.

¶ 9 Counts III, IV, and V charged defendant with criminal sexual assault (720 ILCS 5/12-13(a)(3) (West 2004); 720 ILCS 5/12-13(a)(3) (West 2006)). Count III alleged penis-to-vagina penetration occurring between September 5, 2004, and September 5, 2007. Count IV alleged penis-to-mouth penetration occurring during the same time period. Count V alleged penis-to-mouth penetration occurring between August 1, 2005, and September 5, 2007.

¶ 10 Count VI charged defendant with committing aggravated criminal sexual abuse (720 ILCS 5/12-16(b) (West 2004); 720 ILCS 5/12-16(b) (West 2006)) sometime during the period of September 5, 2005, through September 5, 2007. This count alleged that V.M. was under age 18 at the time of the offense, that defendant was a family member, and that he deposited his semen onto V.M.'s arm for his own sexual gratification or arousal.

¶ 11 B. The Jury Trial

¶ 12 1. *The State's Case in Chief*

¶ 13 The jury trial occurred on January 19 and 20, 2010. In its case in chief, the State called the following witnesses. Under each witness's name, we will summarize the witness's testimony.

¶ 14 a. V.M.

¶ 15 i. *Her Immediate Family*

¶ 16 V.M., who was 18 at the time of trial, resided with her mother, Valencia Wilson, and her three sisters, who were 16 or 17, 15, and 12. Defendant had lived with them off and on. Most of the time, he was incarcerated.

¶ 17 ii. *Various Dwelling Places, the Loci of the Offenses*

¶ 18 V.M. was born in Chicago on September 5, 1991, and when she was in second or third grade, the family moved to Bloomington. At first, V.M., her mother, and her sisters lived in a mission. Afterward, they lived in the following places, in this order: "Sunnyside," "Danberry," and "Turnberry" (as V.M. referred to them). Apparently, these were apartment buildings in Bloomington.

¶ 19 V.M. recounted the various sexual acts that defendant performed on her in each of these places.

¶ 20 (a) Sunnyside

¶ 21 V.M. could not remember how old she was when the sexual abuse started, but she knew she would have been in grade school and younger than 14. At Sunnyside, the abuse always occurred in the living room.

¶ 22    At night, when everyone else was asleep, defendant called V.M. into the living room, asking her to bring him an ashtray or something. When she arrived, he pulled down her pants and stuck his penis in her vagina. Sometimes, when he finished doing that, he compelled her to put his penis in her mouth and to swallow his "sperm." After these sessions, V.M. returned to her bedroom.

¶ 23    V.M. did not tell anyone because, first, she did not think anyone would believe her; second, she was afraid that defendant "might come back for [her]"; and, third, defendant had warned her that if she ever said anything, her mother would "put both of [them] out and get mad."

¶ 24                                    (b) Danberry

¶ 25    From Sunnyside, the family moved to Danberry. V.M. could not remember when, exactly, the move occurred, but she had turned into a teenager by then and was in junior high school.

¶ 26    At Danberry, the sexual abuse always happened in her mother's bedroom. At daytime, when her mother was away at work, defendant sometimes called V.M. out of the bedroom that she shared with her sisters, asking her to help him "or to fix something." He then took her into her mother's bedroom and closed the door behind them. He compelled her to disrobe and to lie down on her back on the bed, and he stuck his penis in her vagina. Sometimes he also had her open her mouth, and he stuck his penis in her mouth and made her swallow his sperm.

¶ 27    Afterward, V.M. returned to her bedroom, sad and upset. Her sisters asked her what was going on, but she refused to tell them.

¶ 28                                    (c) Turnberry

¶ 29    In the next apartment building the family lived in, Turnberry, the sexual abuse happened in the bathroom, in Wilson's bedroom, and in the living room. In all these areas of the apartment, defendant had vaginal intercourse with V.M. and forced her to perform fellatio on him. V.M. emerged from the bathroom hurt–sometimes physically, sometimes emotionally. When she used the toilet afterward, it burned. Defendant made V.M. watch pornographic movies with him late at night in the living room, when everyone else was asleep, and he required her to do to him what the women were doing in the movie.

¶ 30    Defendant also abused V.M. in her mother's car. Because Wilson did not trust defendant with her car–*i.e.*, because she was afraid he would steal it–she insisted, when sending him out on errands, that he take one of their daughters along. He usually chose V.M. While driving, he unzipped his pants and required her to perform fellatio on him. Typically, he drove to a parking lot, such as at Wal-Mart, and commanded her to climb into the backseat, where he had sex with her.

¶ 31    Each time, defendant promised V.M. it was the last time, but there always was a next time–until one day in March 2007, in the bathroom at Turnberry, V.M. resisted. She refused to take his penis into her mouth, and she struggled against him. He "jacked off" and got

sperm on her arms. But this was the last time he bothered her sexually.

¶ 32    Eventually, V.M. confided to a friend at school that defendant had been sexually abusing her. V.M. did not tell her mother right away because she did not want to arouse hatred against her from defendant's side of the family, who would think she was a liar. Also, she thought her mother would be angry because her mother "had feelings" for defendant and might "put [her] out for it."

¶ 33    In March 2008, a couple of weeks after telling her friend, V.M. told her mother. V.M. had missed the school bus that morning, and, consequently, her mother had forbidden her to go outside. V.M. responded by throwing herself onto the floor, going into a state of hysteria, and screaming that she wanted to die. That is when V.M. told her mother that defendant had been raping her for the past 10 years. At first, Wilson asked V.M. if she was making this up. When V.M. denied doing so, Wilson hugged V.M., kissed her, and was very sympathetic.

¶ 34    Previously, in March 2006, Wilson had asked V.M. and her sisters, one by one, if defendant or anyone else had been having sex with them. V.M. specifically denied that anyone had been bothering her sexually. V.M. lied on this occasion because she was afraid that Wilson would become angry with her if she accused her father. She also was afraid that her father would do something crazy, such as hurt her.

¶ 35                                             b. D.M.

¶ 36    D.M., age 16, is one of V.M.'s sisters. When Wilson was away at work, D.M. saw V.M. and defendant doing something "weird": defendant would come into V.M.'s bedroom and ask her to do things for him, and then the two of them, V.M. and defendant, would go into the bathroom or into Wilson's bedroom and stay there together for a long time. When V.M. emerged, she looked upset and sad. D.M. asked her what was wrong, and V.M. replied to D.M. that it was none of her business.

¶ 37    Also, there were times when defendant and V.M. left the house and D.M. had no idea where they went. Defendant just took the keys to Wilson's car and ran off with V.M. Or he sent D.M. and her younger sisters to the store, telling them to take their time, while V.M. stayed in the house with him.

¶ 38                                     c. Richard Horndasch

¶ 39    Richard Horndasch, a pediatrician, examined V.M. on March 28, 2008. V.M. told him that her father had been sexually abusing her since she was four or five years old. She told Horndasch that on many occasions, her father had placed his penis in her mouth and in her vagina. She denied having any pain or bleeding during or immediately following these incidents.

¶ 40    Horndasch testified: "I asked her if he had ejaculated at any time, and I made sure that she knew what I meant by that. And her reply to me was [']I think so but I don't know for sure.['] " This ambivalent reply increased V.M.'s credibility in his eyes. He explained: "[T]he fact that she's admitting to me that she doesn't know typically to me, I interpret that to mean that there's a greater chance that they're telling the truth if they're admitting that

they don't know for sure rather than just saying ['] oh, yeah, yeah, that happened, everything you say happened, yeah.['] "

¶ 41 When examining V.M.'s genitalia with the naked eye, Horndasch saw nothing unusual, but in the colposcopic examination, he saw that the hymen, the thin mucous membrane just inside the lips of the vagina, had been traumatized. The normally smooth contour of the hymen was ragged and irregular, and parts of the hymen were missing. V.M. had suffered a "penetrating trauma to the vagina." The damage was from the 2 o'clock to 10 o'clock regions, as if caused by friction of the penis on the hymen. Horndasch testified: "My conclusion was that the history that [V.M.] gave me and the physical findings on her exam were consistent with each other."

¶ 42 On cross-examination, Horndasch admitted that it was not unusual for 16-year-old females to masturbate and that masturbation possibly could damage a hymen (although, on redirect examination, he testified it would be unusual for masturbation to cause damage to the hymen; it would have to be "extremely rigorous masturbation").

¶ 43 Defense counsel further asked Horndasch, on cross-examination:

"Q. How about if the 16 year old–let me strike that again. Is it unusual in your experience in our society today that a female 16 and a half years old going to a high school living a normal life would have sexual intercourse with peers, males from her school?

MS. MCCOSKEY [(prosecutor)]: Objection, Your Honor.

THE COURT: Sustained.

MR. SERRITELLA [(defense counsel)]:

Q. It is possible that the alteration of the hymen of this girl could have happened from sexual intercourse by someone other than the defendant?

MS. MCCOSKEY: Objection again, Your Honor, and move to strike.

THE COURT: Sustained, stricken.

MR. SERRITELLA: Can I be heard on that, Judge?

THE COURT: I think I know your argument on that. We discussed it previously, no. Objection is sustained, counsel.

MR. SERRITELLA:

Q. Do you know that the damage to this girl's hymen occurred from her having sexual intercourse with the defendant in this case?

A. I do not.

Q. You can't say that, can you?

A. No."

¶ 44 Afterward, during a recess, defense counsel explained that the questions he had posed to Horndasch were not intended to humiliate or compromise V.M. Instead, he had asked those questions "for the reason of showing that there is another mechanism for the alteration of the vagina besides my client having sexual intercourse with her. And a valid very possible explanation for that is if she had intercourse with another man."

-6-

¶ 45    The prosecutor responded that the rape-shield statute required a preliminary hearing outside the presence of the jury and that the defense could not "go on a fishing expedition" in front of the jury. The prosecutor agreed that the defense "would be entitled to produce this evidence if they had specific evidence, dates, times, something to put forth in an offer of proof outside the presence of the jury to show that this could have happened."

¶ 46    Defense counsel responded: "She's correct if I'm talking about cross-examining the alleged victim." But, instead, defense counsel had been cross-examining the State's expert regarding "an alternative mechanism for the alteration of the vagina."

¶ 47    The trial court reasoned:

"The statute does not say that–that you can't cross-examine the alleged victim regarding her prior sexual activity. It says that evidence of the prior sexual activity or reputation of the alleged victim is inadmissible, period. That does not only include cross-examining the victim but any other evidence in the case. It is inadmissible unless the court finds at a hearing outside the presence of the jury that it is constitutionally to be admitted. I agree with counsel that when there is physical evidence presented that is consistent with the allegations that the defense is entitled to present plausible alternative explanations for that. However, that can not be presented until there is [a] hearing outside the presence of the jury. And the questions that counsel was asking of that witness were direct questions about prior sexual activity of the alleged victim other than with the defendant, and those questions are improper under the statute unless we have a hearing outside the presence of the jury."

¶ 48    Anyway, the trial court noted that the evidence that defense counsel had sought to elicit was already in front of the jury. The court remarked:

"I would also note that I believe that the evidence is in front of the jury, albeit not direct questions that you were seeking to ask. However, the jury was clearly told by the question and by the responses of the doctor that he can not testify that it was the defendant's acts that caused this damage. So, that evidence has been presented, albeit not in as direct of form as counsel's wish."

¶ 49                          d. Valencia Wilson

¶ 50    Valencia Wilson was 39 years old and lived in Bloomington with her four daughters, aged 18, 16, 15, and 12 years. Defendant is the father of these children, and his date of birth is November 9, 1971. Wilson was 21, and defendant was 20, when V.M. was born.

¶ 51                          2. *Defendant's Case*

¶ 52                          a. Valencia Wilson

¶ 53    About a year before V.M. claimed that defendant had sexually assaulted her, Valencia Wilson sat each of her daughters down and "specifically asked each of them if they had anything to tell [her] about anybody sexually abusing them." V.M. specifically told Wilson that she "was not being abused."

¶ 54    One day, at Turnberry, V.M. missed the school bus. Wilson told V.M. that since she

missed the school bus and consequently missed school, she would not be permitted to go outside the residence. V.M. became unduly upset. She screamed, stomped around, rolled around on the floor, and said she hated life and that she wanted to die. This hysteria went on for about 15 minutes. On previous occasions, Wilson had disciplined V.M. by forbidding her to go outside, and V.M. had never before become so upset. Wilson asked V.M. why she was upset and whether it was merely because she had forbidden her to go outside. V.M. answered, " ['N]o, it's not that,['] " and then she "shouted out[,] ['D]ad been messing with me.['] " Wilson asked V.M. if she were making this up. V.M. denied doing so. Wilson did not persist in forbidding V.M. to leave the apartment. Instead, she put her arms around V.M. and sympathized with her. About 2 a.m. the next day, after talking with all her daughters, Wilson called the police.

¶ 55 Wilson admitted she had been unhappy with defendant at the time V.M. accused him of sexual abuse. In the past, defendant had stolen from her and had beaten her. He had stolen her car. When defendant was released from prison, however, Wilson allowed him to move back into her residence. She forgave him about the car and let him back in. She and defendant became reconciled after he took her car.

¶ 56 Wilson testified that she found a pornographic tape in the living room and that she scolded defendant for leaving this tape out where the children could find it. She admitted, however, that she never told the police about the tape, although she insisted she had told an assistant State's Attorney who since had taken a job with the Federal Bureau of Investigation.

¶ 57                         b. Michael C. Burns

¶ 58 A detective with the Bloomington police department, Michael C. Burns, interviewed V.M. on March 18, 2008. V.M. told him she was about five or six years old when defendant began sexually assaulting her. According to V.M., defendant made her perform oral sex on him and swallow the sperm when he ejaculated. (V.M. did not use the word "ejaculate," but she referred to "sperm.") V.M. also said that defendant had ejaculated on her arms and that on one occasion, he made her watch a pornographic video. V.M.'s mother never mentioned to Burns that she had found a pornographic video in the apartment.

¶ 59                         c. Eric Riegelein

¶ 60 A Bloomington police officer, Eric Riegelein, interviewed Valencia Wilson on March 15, 2008, and at no time did Wilson tell him about any pornographic tape that she had found in the apartment.

¶ 61                         d. Tracy L. Ortiz

¶ 62 Tracy L. Ortiz, age 41, is defendant's sister. She lived in the Chicago area, in Maywood. She knew Valencia Wilson. According to Ortiz, Wilson telephoned her in March 2008 to complain about defendant's taking her car to Chicago in December 2007 without her permission. At the time of this phone conversation, Ortiz had not heard anything, as of yet, about any sexual-abuse allegations against defendant. According to Ortiz, this is what Wilson

told her on the telephone in March 2008:

> "She said [']I hate your brother. I'm going to get back at him for what he did.['] She kept saying [']I'm going to get Donnie. I'm going to get Donnie. I don't care. Everything that I love ***['] and that's when I got angry and I said, [']you know what, I can't sit here and let you keep talking about my brother like that, you know, over a car. You can't keep talking like that.['] So she is like, [']I hope he die.['] She said that she hopes that he die and that on everything that she loves she going to get him back, and that's what she said."

¶ 63    Defense counsel asked Ortiz:

> "Q. Was this after the daughter had made these allegations that Donnie had sexually assaulted her?
>
> A. No, the daughter–I didn't hear anything about that.
>
> Q. So this was before?
>
> A. This was before.
>
> Q. This was when he stole the car?
>
> A. Well, yes. The–said that he stole the car.
>
> Q. He took her car and went to Chicago?
>
> A. Yes, because when he had an accident in December.
>
> Q. So this was before the allegations were even made by the daughter?
>
> A. Yes."

¶ 64    On cross-examination, the prosecutor confirmed:

> "Q. So you say this was in March of 2008?
>
> A. Correct.
>
> Q. Okay. And, in fact, didn't the offense regarding the car occur in December of 2007, correct?
>
> A. Yes, it did."

¶ 65                              e. Offer of Proof by the Defense

¶ 66    The defense made an offer of proof outside the presence of the jury. Defense counsel called V.M. to the stand and asked her whether, before March 2008, she knew a boy named Shawn. She answered no. Defense counsel asked her whether, before March 28, 2008, she knew a boy named Jamal. She answered no. Defense counsel asked her whether, before March 28, 2008, she had sexual intercourse with any of her boyfriends. She answered no.

¶ 67                              f. Defendant

¶ 68    Defendant, age 38, testified that he had been convicted of burglaries and domestic violence but that he never had been convicted of a sex crime. He had been a drug addict off and on, but he denied that he ever had sexual intercourse with his daughter or that he ever made her have oral sex with him or watch pornographic movies with him.

¶ 69     On cross-examination, defendant admitted that he had lived with his daughters and Valencia Wilson off and on and that on occasion he would call V.M.–and his other daughters–into the bathroom to bring him things. He admitted that at times, he had been in the bathroom with V.M., with the door closed, and that he also would take V.M. in the car with him when no one else was around.

¶ 70     On redirect examination, however, defendant insisted he had been in the bathroom lots of times with his other children, with the door closed. Often, he had his children bring him toilet paper into the bathroom. He explained that Wilson always insisted he take one of the children with him when going to the store, because Wilson did not trust him with her automobile. V.M. was not the only child he took with him. He took whoever wanted to go, sometimes more than one child. He denied ever having sex with V.M. in the car.

¶ 71                                    II. ANALYSIS

¶ 72     A. The Rape-Shield Statute: Cross-Examining Horndasch on the Theoretical
               Possibility That Sexual Intercourse With Someone Else Inflicted
                                the Damage to V.M.'s Hymen

¶ 73     Defendant argues that by sustaining the prosecutor's objection to a question that defense counsel posed to Horndasch on cross-examination, *i.e.*, "Is it possible that the alteration of the hymen of this girl could have happened from sexual intercourse by someone other than defendant?" the trial court violated defendant's right under the sixth amendment (U.S. Const., amend. VI) to confront adverse witnesses. Although the court based its ruling on the rape-shield statute (725 ILCS 5/115-7 (West 2010)), defendant notes that subsection (a) of the statute (725 ILCS 5/115-7(a) (West 2010)) allowed evidence of the alleged victim's "prior sexual activity" if admission of such evidence was constitutionally required.

¶ 74     Section 115-7(a) (725 ILCS 5/115-7(a) (West 2010)) provides that "[i]n prosecutions for predatory criminal sexual assault of a child, *** criminal sexual assault, [and] aggravated criminal sexual abuse"–offenses for which defendant was prosecuted in this case–"the prior sexual activity or the reputation of the alleged victim *** is inadmissible except *** when constitutionally required to be admitted." Courts have interpreted the phrase "the prior sexual activity *** of the alleged victim" as meaning the alleged victim's "sexual history." (Internal quotation marks omitted.) *People v. Sandoval*, 135 Ill. 2d 159, 171 (1990); *People v. Grano*, 286 Ill. App. 3d 278, 288 (1996). So, under an exception written into the rape-shield statute, prior sexual activity of the alleged victim is admissible if admission of such evidence is "constitutionally required." 725 ILCS 5/115-7(a) (West 2010).

¶ 75     The due-process clause of the fourteenth amendment (U.S. Const., amend. XIV) and the confrontation clauses of the federal and state constitutions (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8) guarantee criminal defendants "a meaningful opportunity to present a complete defense." (Internal quotation marks omitted.) *People v. Santos*, 211 Ill. 2d 395, 412 (2004). "[A]n essential component of procedural fairness is an opportunity to be heard." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).

¶ 76     Fairness, however, does not require the admission of evidence which is only "marginally

relevant" or which "poses an undue risk of harassment, prejudice, [or] confusion of the issues." (Internal quotation marks omitted.) *Crane*, 476 U.S. at 689-90. The alleged victim's sexual history is not "constitutionally required to be admitted" unless it would make a meaningful contribution to the fact-finding enterprise. 725 ILCS 5/115-7(a) (West 2010).

¶ 77      The Supreme Court of Illinois has stated, in *dicta*, that the confrontation clause might require the admission of evidence of prior sexual activity by the alleged victim if such evidence were "offered to explain a physical fact such as *** [the alleged] victim's physical condition indicating intercourse." *Santos*, 211 Ill. 2d at 415. The appellate court has expressed that proposition in a holding. *People v. Anthony Roy W.*, 324 Ill. App. 3d 181, 186 (2001). On the authority of *Anthony Roy W.*, 324 Ill. App. 3d at 186-87, and *People v. Hill*, 289 Ill. App. 3d 859, 862 (1997), defendant argues he had a sixth-amendment right to ask Horndasch if the damage to V.M.'s hymen could have resulted from sexual intercourse with someone other than defendant, because in order to defend himself against the State's evidence–in order to present a complete defense–defendant had to present alternative explanations for the damage to V.M.'s hymen.

¶ 78      But if the evidence for an alternative explanation is a different culprit, the defendant must be able to implicate a specific third party. *People v. Bruce*, 185 Ill. App. 3d 356, 364 (1989). The defendant has no right to present evidence in support of the unenlightening truism that it is always "possible," theoretically, that some indefinite third party committed the crime instead of the defendant–who is presumed innocent. *Id.*

¶ 79      *Anthony Roy W.* and *Hill* are distinguishable in this respect because in those two cases, the sexual contact between the child-victim and the third party was more than speculative or theoretical. In *Anthony Roy W.*, 324 Ill. App. 3d at 185, a 14-year-old boy named T.R. testified, in a posttrial hearing, that he had consensual sexual intercourse with the victim in the summer of 1999, before the victim's father was arrested for sexually assaulting her. The appellate court held that the rape-shield statute (725 ILCS 5/115-7 (West 2000)) did not bar this evidence of prior sexual conduct by the victim, because the defendant had a due-process right to present evidence explaining the cleavage in the victim's hymen. *Anthony Roy W.*, 324 Ill. App. 3d at 186.

¶ 80      Likewise, in *Hill*, sexual contact between the child-victim and a third party was more than a matter of speculation. The six-year-old child reported performing fellatio not only on the defendant but also on someone else. *Hill*, 289 Ill. App. 3d at 862. Even though performing fellatio on someone else would have been "prior sexual activity" by the child, the rape-shield statute (725 ILCS 5/115-7 (West 1992)) did not bar this evidence, because the defendant had a constitutional right to explain the child's "age-inappropriate knowledge." *Hill*, 289 Ill. App. 3d at 864.

¶ 81      In the present case, by contrast, when the trial court sustained the prosecutor's objection to the question of whether "the alteration of the hymen of [V.M.] could have happened from sexual intercourse by someone other than defendant," no evidence had been presented, and the court never had been informed that any particular third party had engaged in sexual intercourse with V.M. The offer of proof that the court insisted on (see 725 ILCS 5/115-7(b) (West 2010)) would have been the means of presenting any such information. Section 115-

7(b) of the Code of Criminal Procedure of 1963 provides:

> "No evidence admissible under this Section shall be introduced unless ruled admissible by the trial judge after an offer of proof has been made at a hearing to be held in camera in order to determine whether the defense has evidence to impeach the witness in the event that prior sexual activity with the defendant is denied. Such offer of proof shall include reasonably specific information as to the date, time and place of the past sexual conduct between the alleged victim *** and the defendant. Unless the court finds that reasonably specific information as to date, time or place, or some combination thereof, has been offered as to prior sexual activity with the defendant, counsel for the defendant shall be ordered to refrain from inquiring into prior sexual activity between the alleged victim *** and the defendant. The court shall not admit evidence under this Section unless it determines at the hearing that the evidence is relevant and the probative value of the evidence outweighs the danger of unfair prejudice. The evidence shall be admissible at trial to the extent an order made by the court specifies the evidence that may be admitted and areas with respect to which the alleged victim *** may be examined or cross examined." 725 ILCS 5/115-7(b) (West 2010).

¶ 82     Granted, subsection (b), quoted above, is not directly applicable to this case, because defendant never claimed that V.M. consented to sexual intercourse with him and he never tried to raise consent as a defense (rather, he denied ever having sexual intercourse with her). Nevertheless, subsection (b) is applicable by analogy, in its requirement of "reasonably specific information as to the date, time and place of the past sexual conduct." 725 ILCS 5/115-7(b) (West 2010). If it is inadmissible that on some unspecified date, at some unspecified time, and at some unspecified place, the alleged victim had consensual sex with the defendant, then surely it is inadmissible that on some unspecified date, at some unspecified time, and at some unspecified place, the alleged victim *might* have had sex with some *unspecified* third party. The second proposition is even more vacuous than the first. To confirm that the alternative explanation for the damaged hymen is nothing more than a baseless innuendo, a court could reasonably insist on an offer of proof, by way of analogy to section 115-7(b).

¶ 83     Indeed, the appellate court drew this very analogy in *People v. Grant*, 232 Ill. App. 3d 93 (1992). In *Grant*, 232 Ill. App. 3d at 95-96, the victim, a 13-year-old girl named L.F., testified that in the evening of April 1, 1988, the defendant vaginally penetrated her against her will and that when he was finished, she felt sperm on her vagina and on her underwear. A medical examination of L.F. revealed the presence of seminal material and pubic hair, both of which could have come from the defendant. *Grant*, 232 Ill. App. 3d at 99.

¶ 84     Seminal material, however, could linger in the body for three days (*Grant*, 232 Ill. App. 3d at 96), and at trial, defense counsel asked L.F. if she had told the police she had sex with her boyfriend (someone other than the defendant) earlier in the day of the alleged assault (*Grant*, 232 Ill. App. 3d at 96). The prosecutor objected to this question on the ground of the rape-shield statute (Ill. Rev. Stat. 1987, ch. 38, ¶ 115-7), and the trial court sustained the objection. *Grant*, 232 Ill. App. 3d at 96-97.

¶ 85     Defense counsel then made an offer of proof. Defense counsel stated that, if asked,

-12-

Detective Lawrence Patterson would testify that L.F. had told him she had sex with her boyfriend at noon on March 31, 1998, earlier in the day of the assault. *Grant*, 232 Ill. App. 3d at 98. The prosecutor responded that, on the contrary, he was present during the conversation between L.F. and Patterson and at no time did L.F. mention having sex with her boyfriend. *Id.* The police report did not state she had said that, either. *Id.* at 104. To make the offer of proof even more problematic, defense counsel represented that L.F. had told him she had sex with her boyfriend three or four months before the sexual assault–a representation that was difficult to square with the notion that she had sex with her boyfriend the day of the assault. *Id.* at 96. So, the offer of proof was unclear and self-contradictory. Although the trial court invited defense counsel to develop the offer of proof by calling Patterson to the stand, defense counsel declined to do so. *Id.* at 104.

¶ 86    The appellate court held that because of the lack of certainty and specificity in the defendant's offer of proof, the trial court was correct to sustain the prosecutor's objection to the question of "whether [L.F.] had told the police that she had sex with her boyfriend the day of the alleged rape." *Grant*, 232 Ill. App. 3d at 96. The appellate court explained:

> "[E]ven where the rape[-]shield statute expressly allows evidence of prior sexual activity by its express provisions, which it does as to past sexual encounters between the alleged victim and the defendant, the statute requires a preliminary showing of 'reasonably specific information as to the date, time and place' to be made at an *in camera* hearing before such evidence will be admissible. (Ill. Rev. Stat. 1989, ch. 38, par. 115-7(b).) No less should be required when the defendant seeks to admit evidence of the victim's sexual conduct with others. Defendant presented no specific information regarding the date, time or place of the alleged sexual intercourse with the boyfriend." *Grant*, 232 Ill. App. 3d at 104-05.

Thus, even though, by the terms of the statute, the offer of proof in section 115-7(b) applied only to previous sexual activity between the alleged victim and the defendant, the appellate court held that an offer of proof, of comparable rigor, was required as to sexual activity between the alleged victim and a third party.

¶ 87    This holding in *Grant* makes sense because the mere theoretical possibility that the alleged victim had sex with someone else has little probative value compared to the danger of humiliating the alleged victim by calling into question his or her chastity–a tactic the rape-shield statute is intended to prevent (*Sandoval*, 135 Ill. 2d at 180). A court is not to admit evidence under section 115-7 (725 ILCS 5/115-7 (West 2010)) "unless it determines at the [preliminary] hearing that the evidence is relevant and the probative value of the evidence outweighs the danger of unfair prejudice." 725 ILCS 5/115-7(b) (West 2010). "A defendant in a criminal case may prove any facts or circumstances tending to show that another committed the crime with which he is charged. [Citation.] However, if the evidence is too remote or too speculative [citation], or if it fails to link a third person closely with the commission of the crime [citation], then the trial court should exclude the evidence." *Bruce*, 185 Ill. App. 3d at 364. Defendant in this case provided no evidence implicating any particular third party.

¶ 88                                    B. The Sufficiency of the Evidence

¶ 89                                  1. *V.M's Ambivalence About Ejaculation*

¶ 90        For three reasons, defendant contends the evidence is insufficient to prove him guilty of any of the charged offenses beyond a reasonable doubt. First, he argues that V.M. contradicted herself on the subject of ejaculation. On the one hand, V.M. testified at trial that defendant forced her to perform fellatio on him and to swallow his semen. She also testified that on one occasion, when he had her corralled in the bathroom, he masturbated and ejaculated on her arms. V.M. told these same things to the police. A detective, Michael C. Burns, testified that V.M. told him defendant forced her to "perform oral sex on him and swallow the sperm when he ejaculated" and that defendant had "ejaculated on her arms."

¶ 91        On the other hand, Horndasch testified: "I asked [V.M.] if [defendant] had ejaculated at any time, and I made sure that she knew what I meant by that. And her reply to me was [']I think so but I don't know for sure.['] " Defendant contends that this ambivalence or contradiction about ejaculation is especially problematic for count VI of the indictment, which charges him with committing aggravated criminal sexual abuse (720 ILCS 5/12-16(b) (West 2004); 720 ILCS 5/12-16(b) (West 2006)). According to that count, the "act of sexual conduct *** involv[ed] the transmission of semen by the defendant upon the arms of V.M." Defendant disputes that he can be found guilty beyond a reasonable doubt of transmitting semen on V.M.'s arms if the only evidence he did so was V.M.'s testimony and she ultimately was unsure he ever ejaculated.

¶ 92        As to count VI, a rational jury *could* find reasonable doubt, considering that V.M. told Horndasch she thought defendant had ejaculated but she was unsure he had done so. When we regard all the evidence, however, in a light most favorable to the prosecution, we are unconvinced it would be impossible for any rational trier of fact (acting rationally) to find that defendant ejaculated on V.M., as alleged in count VI. See *People v. Brink*, 294 Ill. App. 3d 295, 300 (1998). Just because V.M. was ambivalent on one occasion and positive on other occasions, it does not follow that every rational mind would regard her as unworthy of belief, especially considering (1) the physical evidence and (2) the sister's testimony about defendant's "weird" behavior of calling V.M. into the bedroom or bathroom with him and V.M.'s emergence, after "a long time," with a sad and upset look on her face. V.M. could have been nervous or confused in the doctor's office, and young people talking with adult strangers can be unnecessarily ambivalent when they are nervous or confused.

¶ 93        The most that can be said is that V.M. was momentarily ambivalent. It is not that she denied ejaculation in one interview and alleged ejaculation in another interview. Instead, she stated, on one occasion, that she was unsure defendant had ejaculated but she thought he had done so, and on other occasions, she positively stated he had ejaculated. This is barely an inconsistency; it is merely an inconsistency in the level of certainty. We would not be justified in overturning the jury's credibility determination on such a weak basis. Unlike us, the jury had an opportunity to observe V.M. and other witnesses as they testified, and therefore the jury was in a better position to weigh the witnesses' credibility. See *People v. Billings*, 372 Ill. 433, 441 (1939). We decline to second-guess the jury in that respect. See *id.*; *Brink*, 294 Ill. App. 3d at 300; *People v. Williams*, 332 Ill. App. 3d 693, 696-97 (2002);

*People v. Miller*, 101 Ill. App. 3d 1029, 1041 (1981).

¶ 94        2. *Horndasch's Admitted Lack of Knowledge That the Damage to*
                *V.M.'s Hymen Resulted From Sexual Intercourse With Defendant*

¶ 95        The second reason why, according to defendant, the evidence is insufficient to support
the convictions is that Horndasch admitted he did not "know" that defendant–or, for that
matter, anyone–had sexually abused V.M. Horndasch admitted, on cross-examination, that
he did not "know how [V.M.'s] hymen became altered" and he did not "know that the
damage to this girl's hymen occurred from her having sexual intercourse with the defendant."
Defendant maintains that without such knowledge on the part of Horndasch, the State could
not have proved defendant guilty of the charges beyond a reasonable doubt.

¶ 96        We disagree. Horndasch testified that the damage to V.M.'s hymen was consistent with
her account that defendant had sexually abused her. Horndasch was not the trier of fact, and
there is no indication that he heard all the evidence the jury heard. And, besides, the standard
is not knowledge; rather, the standard is proof beyond a reasonable doubt.

¶ 97        3. *Suggested Motivations of V.M. and Her Mother*
                *To Falsely Incriminate Defendant*

¶ 98        According to defendant, the third reason why the evidence is insufficient to convict him
is that both V.M. and her mother, Valencia Wilson, had motivations to falsely incriminate
him. V.M.'s motivation, defendant claims, was to escape the consequences of missing the
school bus. Those consequences would have been Wilson's displeasure and not being
allowed to go outside.

¶ 99        As for Wilson, defendant claims she falsely incriminated him in order to get back at him
for taking her car to Chicago in December 2007 without her permission. In support of this
claim of retaliation, defendant cites the testimony of Tracy L. Ortiz, his sister. Ortiz testified
that in March 2008, before Ortiz heard anything about allegations of sexual abuse, Wilson
telephoned her and angrily vowed to get revenge against defendant for taking her car.
According to Ortiz, Wilson declared that she hated defendant and that she hoped he would
die, and she vowed, by everything she loved, to wreak vengeance on him. At the time, Ortiz
responded to Wilson, " [']I can't sit here and let you keep talking about my brother like that,
you know, over a car.['] "

¶ 100       Defendant argues that Ortiz's testimony "stood unrebutted." Perhaps, though, Ortiz's
testimony was so implausible that a rebuttal was unnecessary, considering that it was in
December 2007 when defendant took Wilson's car to Chicago without her permission. The
jury might have wondered as follows: Why would Wilson wait until March 2008 to
telephone Ortiz and inform her, in a white-hot fury, that she hated defendant, and wished him
dead, for taking her car three months ago? And if, in March 2008, Wilson wanted to take
revenge on defendant for stealing her car in December 2007, why did she allow him to move
back in with her about a month after he took the car? According to Wilson's testimony,
which was uncontradicted in this respect, she and defendant became reconciled, and he

moved back in with her, about a month after the car incident. Arguably, for these reasons, Ortiz's testimony was implausible on its face, and there was nothing to be rebutted.

¶ 101 The jury also could have found it implausible V.M. would falsely accuse her father of sexually abusing her just so that her mother would not be irritated with her for missing the school bus and just so that her mother would allow her to go outside the house that day. The motivation does not seem very compelling.

¶ 102 In sum, when we look at the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find the elements of the charged offenses to be proved beyond a reasonable doubt. See *Brink*, 294 Ill. App. 3d at 300. We would not be looking at the evidence in a light most favorable to the prosecution if we overturned the jury's credibility determinations in this case.

¶ 103 C. The Child Advocacy Center Assessment
as an *Ex Post Facto* Punishment

¶ 104 The trial court assessed a "Child Advocacy Center Fee" against defendant in the amount of $15. See 55 ILCS 5/5-1101(f-5) (West 2010). The appellate court has held that a children's advocacy center assessment is actually a fine, not a fee, because instead of reimbursing the State for a cost of the prosecution, it is part of the punishment imposed upon the defendant's conviction. *People v. Williams*, 405 Ill. App. 3d 958, 965-66 (2010).

¶ 105 Defendant argues that, in this case, the children's advocacy center assessment is an *ex post facto* punishment because he committed his offenses during the period of February 24, 2000, to September 5, 2007, before the statute authorizing the imposition of the assessment went into effect on January 1, 2008. See Pub. Act 95-103, § 5 (eff. Jan. 1, 2008) (amending 55 ILCS 5/5-1101). "The constitutional prohibition against *ex post facto* laws prevents the punishment for an offense being increased by an amendatory act taking effect after the offense has been committed." (Internal quotation marks omitted.) *People v. Bosley*, 197 Ill. App. 3d 215, 220 (1990). The State agrees with defendant that the children's advocacy center assessment should be vacated on *ex post facto* grounds. We agree, too.

¶ 106 III. CONCLUSION

¶ 107 For the foregoing reasons, we affirm the trial court's judgment in part and vacate it in part. We vacate the children's advocacy center assessment, and we remand this case with directions to the trial court to issue an amended sentencing judgment. Otherwise, we affirm the judgment. We award the State $50 in costs against defendant.

¶ 108 Affirmed in part and vacated in part; cause remanded with directions.